Peter Bibring, SBN 223981
peter@bibringlaw.com
LAW OFFICE OF PETER BIBRING
2210 W. Sunset Blvd. #203
Los Angeles, CA 90026
(213) 471-2022

*Attorney for Plaintiff*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

SEAN BECKNER-CARMITCHEL, CHELSEA L. JONES,

PLAINTIFFS,

v.

CITY OF LOS ANGELES, a municipal entity; OFFICER PABLO A. MOLINA MORALES, in his individual capacity, and Does 1 to 20,

DEFENDANTS.

Case No. 2:26-cv-6462

**COMPLAINT**

JURY TRIAL DEMANDED

## JURISDICTION AND VENUE

1. This is an action for damages for violations of Plaintiff's federal and state constitutional and statutory rights. Jurisdiction exists pursuant to 28 U.S.C. §§ 1331 and 1343 as Plaintiffs asserts a claim under 42 U.S.C. § 1983. Jurisdiction also exists pursuant to 28 U.S.C. §§ 2201(a) and 2202, the Declaratory Judgment Act. The Court has supplemental jurisdiction to consider Plaintiffs' state law claims under 28 U.S.C. § 1367 as these state law claims arise from the same common nucleus of operative facts as Plaintiff's federal claims.

2. Venue is proper in the Western Division of the Central District of California pursuant to 28 U.S.C. § 1391(b) because the events and conduct giving rise to Plaintiffs' claims all occurred in the City of Los Angeles, Plaintiffs both reside in the City of Los Angeles, and defendant City of Los Angeles is located in the division.

3. Plaintiffs have complied with the requirements of the California Government Claims Act, Gov't Code §§ 810 *et seq*.

## PARTIES

4. Plaintiff Sean Beckner-Carmitchel is a California resident, who lives in the City of Los Angeles. Mr. Beckner-Carmitchel is a freelance journalist who has worked in the Southern California area for the past six years. Mr. Beckner-Carmitchel produces video, audio, photos and articles about a range of events and topics, with a focus on law enforcement agencies and public protests. His work has been published by various news organizations, including CNN, ABC's Good Morning America, BBC, The New York Times, CalMatters, the Beverly Hills Courier, Los Angeles Public Press, and Knock LA. Mr. Beckner-Carmitchel also posts videos and reporting on social media accounts including on BlueSky and on YouTube. Numerous pictures he took of immigration protests in summer 2025 appeared in news outlets, including a picture of the events described below of August 8, 2025, that appeared in the Los Angeles Times.

5. Plaintiff Chelsea L. Jones is a resident of California who lives in Los Angeles County. She is employed as staff photographer with Shutterstock, where she has

worked since 2015. Ms. Jones has worked as a professional photographer since about 2008. She has worked for major news services including Getty Images, Variety, WireImage, and Filmmagic, covering photography from celebrity portraits and fashion to major entertainment events and news. She has photographed protest movements including Black Lives Matter protests in 2020, the trial and sentencing of Derek Chauvin in Minneapolis in 2021, and the protests of immigration raids in 2025.

6. Defendant City of Los Angeles (the "City") is a municipal corporation duly organized and existing under the Constitution and laws of the State of California. The Los Angeles Police Department ("LAPD") is an agency of Defendant City and all actions of the LAPD are the legal responsibility of the City. At all relevant times, Defendant City was responsible for assuring that the actions, omissions, policies, practices, and customs of the LAPD and its employees and agents complied with the laws of the United States and the State of California.

7. Defendant Officer Pablo A. Molina Morales, Badge No. 25937, is an LAPD officer and an employee of Defendant City of Los Angeles.

8. Plaintiff is ignorant of the true names and capacities sued herein as Does 1 through 20, inclusive, and therefore sues these Defendants by such fictitious names. Plaintiff will amend to allege their true names and capacities when ascertained.

9. Plaintiff is informed, believes, and thereupon alleges that Does 1 through 10 are LAPD officers assigned to police the protest where Plaintiffs were injured and who participated in the actions and decisions that caused Plaintiff harm, as alleged below.

10. Plaintiff is informed, believes, and thereupon alleges that at all times relevant hereto DOES 11 through 15, in addition to the named Defendants, are LAPD officers and supervisors who participated in, approved, directed, or ratified the decisions of individual LAPD officers in the violations of Plaintiff's rights alleged below.

11. Plaintiff is informed, believes, and thereupon alleges that Does 16 through 20 are LAPD commanders, members of the City Attorney's office, and/or other employees, agents, and servants of the City who participated in the decision to clear

journalists from a protest area using force as described below and to detain journalists for remaining in an area closed to protesters, as described below, thus preventing Plaintiffs from photographing, videotaping, and documenting the protest and police response to him, and threatening to arrest Plaintiffs, and actually arresting them.

## FACTUAL ALLEGATIONS

### A. The *Los Angeles Press Club* action and Temporary Restraining Order

12. After federal immigration officials began aggressive immigration enforcement operations in and around Los Angeles on June 6, 2025, people gathered in downtown Los Angeles over multiple days to protest the immigration raids, in both large demonstrations numbering tens of thousands and small protests with just a few dozen.

13. Journalists flocked to cover the demonstrations, first as a reflection of the enormous popular opposition to the federal administration's immigration policies and then increasingly to cover aggressive policing of the protests by police. Both the immigration raids and the demonstrations against them received widespread national and even international news coverage.

14. LAPD responded with demonstrations with extraordinary force and a total disregard for the rights of the press. Over and over, day after day, LAPD officers shot journalists clearly identified as press at close range with so-called "less-lethal munitions" ("LLMs"). LAPD officers rammed journalists wearing cameras and press identification with horses. They fired LLMs indiscriminately into crowds containing journalists, without provocation, and with no apparent effort to avoid hitting journalists. They used LLMs in ways prohibited by state law and their own policies, shooting people in the head and upper body, both prohibited targets because of the potential to cause serious injury to critical organs and even death And they repeatedly detained journalists, kettled them with protesters, ordered them to move out of public places where they posed no threat and were not interfering with police, and told press they would be arrested if they remained in the area in blatant violation of California law.

15. On June 16, 2026, the Los Angeles Press Club, a membership association of

journalists, and Status Coup News, an independent investigative reporting network and media outlet, filed suit against LAPD alleging widespread violations of the rights of journalists under both the First Amendment and California statutes that specifically protect journalists covering protests. *See L.A. Press Club et al. v. City of Los Angeles et al.,* No. 2:25-cv-05423 HDV-E (C.D. Cal.) ("*L.A. Press Club*"). On July 3, 2025, the plaintiffs moved for a temporary restraining order and preliminary injunction prohibiting further violations of the constitution and state law.

16. On July 10, Judge Vera granted Plaintiffs' application and issued a Temporary Restraining Order ("TRO"), recognizing plaintiffs were likely to prevail on their claims that LAPD was violating their First Amendment rights and causing irreparable injury. *See Los Angeles Press Club v. City of Los Angeles*, 790 F. Supp. 3d 838 (C.D. Cal. 2025). The TRO imposed, in relevant part, the following restrictions on the LAPD:

> 2. If LAPD or another law enforcement agency establishes a police line or rolling closure at a demonstration, march, protest, or rally where individuals are engaged in activity that is protected pursuant to the First Amendment to the United States Constitution, LAPD is enjoined from:
>
> > a. Prohibiting a journalist from entering or remaining in the closed areas.
> >
> > b. Intentionally assaulting, interfering with, or obstructing any journalist who is gathering, receiving, or processing information for communication to the public (including by restricting journalists to areas from which they do not have sufficient opportunity to observe and report on protests, including the interaction between police and protesters).
> >
> > c. Citing, detaining, or arresting a journalist who is in a closed area for failure to disperse, curfew violation, or obstruction of a law enforcement officer for gathering, receiving, or processing information. If LAPD detains or arrest a person who claims to be a journalist, that person shall be permitted to promptly contact a supervisory officer of the rank of captain or above for purposes of

challenging that detention, unless circumstances make it impossible to do so.

3. LAPD is further enjoined from using less-lethal munitions ("LLMs") and other crowd control weapons (including kinetic impact projectiles ("KIPs"), chemical irritants, and flash-bangs) against journalists who are not posing a threat of imminent harm to an officer or another person.

4. Within the next 72 hours, LAPD management is ordered to summarize this Order and disseminate its contents to all LAPD officers responding to a protest in Los Angeles.

*Id.* at 849.

**B. The Events of August 8, 2025**

17. On August 8, 2025, protesters rallied at the Home Depot in Westlake, just outside of downtown Los Angeles, and, over the course of approximately two hours, peacefully marched from the Home Depot to the federal MDC, until about 100 people were assembled on Alameda Street outside the garage entrance to the MDC. The group remained peaceful.

18. A short time after the protesters arrived, just before 9 p.m., LAPD officers drove up in police vehicles. Soon after that, more LAPD officers ran down Alameda and formed a line across the street. Then, with no warning and no dispersal order, the officers started shouting "move back" as they quickly advanced, shoving the assembled group of protesters and press and striking them with batons.

19. As the police assaulted the protesters to force them to move back more, there was no area where press could be to observe and document the protest and the police response without being assaulted by the LAPD. When members of the press asserted their right to remain, to have a press information officer ("PIO") or command officer called and the Court's Order affirming their rights, officers ignored them or told them to wait.

20. One journalist held up the press pass to officers to show them he was a journalist. Moments later one of the officers struck him, knocking into the press pass as

he held it and striking him in the face, slicing open his chin with a gash that required stitches.




21. Plaintiff Chelsea L. Jones was photographing the protest when LAPD officers arrived and started pushing and striking protesters. After initially pushing protesters and press down Alameda street some distance with shoves and baton strikes, LAPD's line stopped. Ms. Jones was photographing the protest near the skirmish line to capture the officers facing protesters. She stood on the sidewalk, not the street, off to one side of the protesters, to be out of the way and so she could get a shot of the whole line.

22. Ms. Jones was plainly identifiable as a journalist. She wore a large lanyard around her neck which displays three different press identification badges (one from LAPD, one from the Los Angeles Sheriff's Department, and one from her employer, Shutterstock) side by side so that all are visible. She carried two large, professional-grade SLR cameras, each with a large, beige professional telephoto lens. She wore a helmet and a large backpack for her photographic gear.

23. The line of LAPD officers again began to move, abruptly and without any dispersal orders, with officers simply shouting, "Move!" or "Get back!" Ms. Jones attempted to move backwards but was blocked by protesters and other members of the press. As the officer in front of her yelled, "Move!" or "Get back!" again, Ms. Jones repeatedly responded, "I'm trying!," while holding her camera up to show officers she was press

24. As Ms. Jones tried to back up ahead of the advancing officers, she ran into a large, cement bollard placed in the sidewalk by the MDC entrance. When the impact

slowed her, the officer in front of her shoved her hard with his baton, knocking her to the street. In the moments before the officer shoved Ms. Jones, her press passes and camera were directly in front of his face, in his line of vision:




25. When the officer shoved Ms. Jones to the ground, she hit the pavement hard, bruising herself badly. The impact cracked one of her camera lenses worth

approximately $3,000. While Ms. Jones was on the ground, in pain, she could not get up because she was wearing a large backpack and carrying two large cameras. While she was on the ground, at least one officer raised his baton and feinted as if he were going to strike her. She was terrified and only got up when someone — a protester or another journalist — grabbed her backpack by the handle on its top and pulled her away and to her feet.

26. The officer who shoved Ms. Jones did not wear a helmet bearing his name, as many other officers did. Upon information and belief, the officer who shoved Ms. Jones to the ground is Defendant Pablo A. Molina Morales.

27. The impact from Officer Molina Morales shoving her to the ground left Ms. Jones sore for weeks.

28. Plaintiff Sean Beckner-Carmitchel was also covering the protest that evening, carrying several professional cameras and wearing his press identification card from the Los Angeles Press Club, which is a laminated photograph of him and the words "PRESS" in 72-point font, on a lanyard attached to his clothes.

29. A few moments after LAPD officers shoved Ms. Jones to the ground, their skirmish line again stopped. Mr. Beckner-Carmitchel approached the line of officers and asked them to send over a PIO or commanding officer. Officer Molina Morale — the same officer who had shoved Ms. Jones to the ground — simply yelled "Get back!" Mr. Beckner-Carmitchel repeated his request for a PIO or commanding officer noting they were press and mentioning the TRO.

30. Officer Molina Morales responded to Mr. Beckner-Carmitchel by shouting "Move!" and striking him hard in the ribs with a baton, fracturing one of his ribs. As LAPD officers continued to use force to push press and protesters back, Beckner-Carmitchel asked multiple times that LAPD officers call a PIO officer, as provided for in the Court's Order. Officers responded with blank stares, except for one officer who responded: "That's not important right now."

31. It was not until well after LAPD officers forcibly pushed the protesters back

a block from MDC that LAPD officers gave any dispersal order. While most of those assembled then left, approximately 20 protesters remained along with members of the press, including Mr. Beckner-Carmitchel. LAPD officers forced the group into a small side street, then ordered everyone remaining to get up against a nearby wall and told them they were under arrest. LAPD officers made no distinction between protesters and journalists.

32. LAPD officers, Defendants Does 2 to 10, placed the journalists, along with the 20 or so protesters, in zip-ties and held them against the wall for more than an hour. Although Beckner-Carmitchel repeatedly identified himself as a journalist and asserted his rights under California Penal Code Sec. 409.7 and the *Los Angeles Press Club* TRO, the officers ignored him and one responded that "it didn't matter right then." Beckner-Carmitchel asked for a supervisor or PIO about 10 more times, all to no avail.

33. Eventually an LAPD officer asked Mr. Beckner-Carmitchel for his name and my identifying information. Mr. Beckner-Carmitchel told the officer that his ID was in my wallet in his right pocket, beneath his press identification. The photo below shows Mr. Beckner-Carmitchel zip-tied, his press identification plainly visible at his waist.



34. Officers kept Mr. Beckner-Carmitchel flex-cuffed and ordered him to stand

next to the wall about 1-2 hours. They then released Mr. Beckner-Carmitchel with a Field Information ("FI") card filled out by an officer, noting he was "Detained during an illegal assembly. Failed to disperse after multiple dispersal orders."

**C. June 9 incident**

35. In an earlier incident, on June 9, 2025, Ms. Jones was hit by a less-lethal munition that, upon information and belief, was a 40mm rubber bullet fired by LAPD.

36. On the evening of June 9, Ms. Jones had been working as a photographer at the BET awards at the Peacock Theater by L.A. Live. After she finished her assignment, she went to the civic center area, where there had been protests the last several days, to see if there were any protests to photograph.

37. At about 10:45 p.m., Ms. Jones encountered a line of police officers across First Street at San Pedro Street in Little Tokyo, facing south along First Street toward a group of protesters that were about halfway down the block. After a few minutes, Ms. Jones walked up to them, identified herself as a journalist, and asked if it was alright to go down the street. They told her it was.

38. Ms. Jones took some photographs of the line of officers. There were officers from multiple agencies on the line. While she was watching, at least one and possibly two officers fired less-lethal rounds towards the protesters. Upon information and belief, both the officers who fired were from LAPD.

39. Ms. Jones walked down First Street to where the protesters were standing. There were only a handful of them. She took some photographs, mostly standing in the center of the street, which was closed to traffic, taking photos looking back toward the officers.

40. At some point, the only people within half a block of Ms. Jones were one or two protestors who were in an area at the curb of the street fenced off for dining. Ms. Jones in the center of the street, and slightly further from officers. One protestor lit a firework rocket that shot high into the air over the street, and Ms. Jones photographed him. The firework detonated high in the air and did not come anywhere near the officers.

The officers fired LLMs at the one or two protestors, and the protesters ran away along the sidewalk, away from the officers. Ms. Jones remained standing in the middle of the street and began reviewing the photos she had taken on the screen of her digital SLR camera and uploading them from her camera to her editors, who were on a desk posting them in real time. Ms. Jones was holding the large professional camera, up and in front of her where it was visible to police, with another large camera with a large, telephoto lens, hanging from her left shoulder and visible to police. About a minute after the protesters ran away, she heard the bang of a less-lethal launcher from the police line and felt an impact on her left thigh. Upon information and belief, one of the LAPD officers who had fired rubber bullets earlier, Defendant Doe 1, fired and struck Ms. Jones entirely without justification. Ms. Jones was not doing anything at the time that could be perceived as threatening to officers or anyone else. She was standing in the middle of a well-lit, empty street reviewing photos on a professional digital camera.

41. The impact of the 40mm shot by defendant Doe 1 left Ms. Jones severely bruised on her left thigh and in pain for several days.

42. These events physically injured Plaintiffs and had a significant chilling effect. Ms. Jones has been out to photograph protests only once since August 8, 2025, in large part because of fear of physical harm based on the injuries she suffered. The injury to Mr. Beckner-Carmitchel prevented him from returning to photograph for some time while he healed.

**D. LAPD's Longstanding Pattern of Violating the Rights of People and Press at Demonstrations**

43. Despite decades of massive protests in the City, and despite express warnings of the failures of law enforcement policies over this same time period, the LAPD met the ICE protests in the summer of 2025 with the same unlawful practices it had used for years. After protests in response to the killing of George Floyd in May 2020, one internal and two external reports were critical of the LAPD's response to the Floyd protests and all recommended retraining of officers and command staff in the

LAPD on crowd control practices.

44. Significantly, in the range of crowd control issues addressed, LAPD was specifically criticized for its treatment of reporters and photographers covering the protests. Repeatedly, police subjected reporters to physical force and arrest and prevented access to observe police activity in public places. In response to widespread abuses by law enforcement agencies in general and the LAPD in particular, legislators amended the California Penal Code to protect press from police assault and interference with news-gathering operations. However, despite posting multiple memos to all personnel regarding the new laws, as proven by recent events, the LAPD did not follow its own policies or the new law.

45. The LAPD has a long and entrenched history of using force to obstruct freedom of the press. In *Crespo v City of Los Angeles*, 2:00-cv-08869 GHK (RC) (C.D. Cal. 2000), the Los Angeles Police Department was sued for clubbing reporters and shooting them with less lethal weapons during the 2000 Democratic National Convention ("DNC"). The LAPD entered into a settlement with the ACLU, requiring the police recognize the rights of journalists to cover protests even if an unlawful assembly is declared and an order to disperse is given. As part of the settlement, the City also agreed to assign a liaison to work with members of the press and to designate areas for journalists to observe from. In a 2001 Los Angeles Times article, retired Asst. Chief Horace Frank, then a lieutenant in the LAPD, asserted that the settlement did not impose any obligation on the LAPD that it was not already doing. See Jill Leovy, *7 Reporters Settle Suit Over LAPD*, L.A. Times (Nov. 30, 2001), https://www.latimes.com/archives/la-xpm-2001-nov-30-me-9832-story.html. If true, there was no burden on the LAPD from complying with the Crespo settlement.

46. Although the LAPD claimed two decades ago that it was already doing what the settlement in Crespo required, just a few years later the department violated reporters' First Amendment rights to cover public protests in its unprovoked assault on a May Day immigrants' rights rally in MacArthur Park. The LAPD's attack on protesters

and press on May 1, 2007, violated settlement agreements reached to redress the police assault on protesters and press at the Democratic National Convention in 2000 at the Staples Center. In a damning report, the LAPD conceded that it had failed to incorporate the lessons learned after the 2000 DNC debacle.

47. Among the journalists who sued was a camera operator for Fox 11 News who required repeated surgeries for a shoulder injury she suffered when officers struck her and knocked her down. See Dennis Romero, *Journalist Gets $1.7 Million In Suit Against LAPD Over 'May Day Melee' Response*, LA Weekly (July 9, 2010), https://www.laweekly.com/journalist-gets-1-7-million-in-suit-against-lapd-over-may-day-melee-response/.

48. In the 2020 George Floyd protests, the U.S. Press Freedom Tracker identified 23 incidents in the Los Angeles area in which members of the press reported being arrested, subjected to force, and otherwise prevented from exercising their First Amendment rights.

49. More recently, the LAPD repeated the same unlawful practices during a police action to evict an encampment of unhoused persons at Echo Park Lake in March 2021. According to the U.S. Press Freedom Tracker, 59 journalists were arrested or detained nationwide in 2021 with more than a quarter of that number involving the LAPD at the Echo Park Lake incident.

50. Although the LAPD reported that it encourages its personnel not to interfere with the press "whenever possible," it attempted to justify the arrest of press at the Echo Park event as permissible under California Penal Code Sections 407 and 409, as explained in the LAPD's Media Relations Handbook. That erroneous view of the law by the LAPD has now explicitly been rejected by amendments to the Penal Code to add Section 409.7 to ensure that members of the media are exempt from dispersal orders and are not subject to arrest for failure to disperse.

51. The LAPD response on August 8, 2025, continues this long and disgraceful history of unconstitutional actions against journalists. Defendants have deliberately

disregarded court orders placing limitations on "crowd control" policies and explicit statutory protections for members of the press at protests.

52. As the facts alleged above demonstrate, despite the LAPD's written policies, there is a widespread and persistent de facto policy, custom, and practice in LAPD of ignoring written policies in crowd control situations and using force against both members of the public and journalists without lawful justification, both intentionally and indiscriminately, using force to retaliate against journalists and photographers for reporting on and documenting police activity, and excluding journalists from public streets, sidewalks and parks where they are gathering information, in violation of the U.S. and California constitutions and California law, and in often violation of LAPD's own written policies.

53. On September 10, 2025, Judge Vera granted a preliminary injunction in the *Los Angeles Press Club* case. In so doing, the court held that plaintiffs were likely to succeed in showing that LAPD had a *de facto* custom and practice of violating the rights of members of the press, based on evidence of LAPD's widespread uses of force against and unlawful restrictions of journalists in June, July and August 2025 — including evidence of LAPD's conduct in the August 8 incident described here:

> Plaintiffs have established that the LAPD has a consistent custom or practice of dispersing the press and subjecting them to unlawful uses of force. *See supra* Part I; *Multi-Ethnic Immigr. Workers*, 246 F.R.D. at 627 (recounting the history of "unlawful dispersal orders and excessive force orders against demonstrators," leading to "settlements that set forth standards for the LAPD in regards to unlawful assemblies, dispersal orders, and treatment of the media"). Indeed, the passage of sections 409.7 and 13652 were motivated (in part) by the LAPD's long history of constitutional violations against media. *See* Sen. Pub. Safety Comm. Analysis, Sen. Bill 98, 2021–2022 Reg. Sess. at 5–6 (noting uses of force against media in Los Angeles); Assem. Pub. Safety Comm. Analysis, Sen. Bill 48, 2021–2022 Reg. Sess. at 11 (same). The similarity of Plaintiffs'

allegations with the LAPD's historical violations also suggests that Defendants' practices were the moving force behind Plaintiffs' allegations. Given this record—and the sheer number of instances proffered by Plaintiffs—the Court is satisfied that Plaintiffs have met their burden of showing a likelihood of prevailing on their *Monell* claims.

*Los Angeles Press Club v. City of Los Angeles*, 799 F. Supp. 3d 1007, 1032 (C.D. Cal. 2025).

54. Unquestionably by August 8, 2025, City had either actual or constructive knowledge of the different policies, practices, and customs alleged in the paragraphs above and the foreseeable consequences of the failure to implement and train on these state statutes and constitutional rights afforded to members of the reporters and photographers at protests.

55. The City was aware of assaults on press rights at the DNC in 2000, which led to the Crespo settlement. The LAPD's operating principle was then and continues to be that the press "interfere" despite multiple adverse court decisions and the enactment of specific provisions in the California Penal Code to guarantee press access free of force by law enforcement agencies to prevent access. In his 2001 deposition in litigation arising out of LAPD's use of force at the 2000 DNC, former Chief Bernard Parks testified:

> I think the press has an obligation not to interfere with an unlawful assembly and dispersal, and the police in declaring that are declaring it for all people that are at that assembly location, including the press, and historically by our policy and the direction from our city attorney, the press has no right to be at what is viewed to be a crime scene, which is an unlawful assembly. It's distinguished from being a disaster area. A crime scene is not a disaster area.

56. The repeated failure of policy to provide press access at protests in both the May Day 2007 and the 2020 George Floyd events was documented in after-action reports issued by the Los Angeles Police Department and by independent investigations

commissioned by the Los Angeles City Council.

57. The City also acted or failed to act with deliberate indifference to Plaintiff's constitutional and statutory rights.

58. Defendants' actions were malicious, oppressive, and in reckless disregard of Plaintiffs' rights, entitling them to punitive damages against the individual Defendants.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### Violation of the First and Fourteenth Amendments to the U.S. Constitution; 42 U.S.C. § 1983
### (Against all Defendants)

59. Plaintiffs reallege and incorporate herein by reference the preceding and any subsequent paragraphs in this Complaint.

60. The First Amendment guarantees the right of the press to access areas necessary to engage in coverage of newsworthy events, such as demonstrations, and government conduct, such as the actions of police, free from interference by tactics such as unlawful use of force or threats of force, especially when they are covering law enforcement conduct in public fora.

61. Plaintiffs were not engaged in any unlawful activity in the course of their reporting. Plaintiffs never obstructed or interfered with officers or posed a threat to anyone.

62. Plaintiffs were obviously photographers and journalists engaged in photographing the protest on public streets and sidewalks. Defendants Molina Morales and Does 2 to 10 nonetheless pushed them and hit them with batons, and Defendant Doe 1 fired an LLM at Plaintiff Jones, in order to force them to move from public streets and sidewalks, ordered them to move from those public street and sidewalks, and/or detained or arrested them denying them access to document the demonstration and police response, without regard to their apparent status as journalists.

63. There was no legitimate justification whatsoever for any of the actions of

Defendants.

64. Upon information and belief, Defendants Does 11 to 15 knew of LAPD officers' (including Defendant Does 1 to 10) practice of policing protests by pushing demonstrators, striking them with batons, knocking them down, firing LLMs without justification, and kettling and detaining them, without regard to whether they were protesters or journalists, and Does 11 to 15 participated in, approved, directed, or ratified the decisions and actions of individual LAPD officers in the violations of Plaintiff's rights alleged herein; and they intended that result or were deliberately indifferent to the risk that people attending the demonstration would get shoved down or hit with batons, have their access to document demonstrations denied, and be retaliated against for engaging in expressive conduct, and experience other violations of the First Amendment.

65. In doing the acts complained of herein, Defendants unlawfully prohibited Plaintiff from accessing public streets for the purpose of observing and documenting demonstrations and police activity, and/or in retaliation for Plaintiff engaging in protected First Amendment activity.

66. In excluding Plaintiff from a public forum and retaliating against him for engaging in constitutionally protected activity, Defendants acted pursuant to a policy, custom, or practice of the City of Los Angeles.

67. Upon information and belief, Defendants Does 16 to 20 participated in forming the LAPD's policy, training, custom and practice on dispersal of people at demonstration, and treatment of reporters and photographers at demonstrations. Defendants Does 16 to 20 knew that the polices they created, promulgated, advanced, and endorsed would likely result in violations of the constitutional rights of members of the public such as Plaintiffs, or were deliberately indifferent to that risk.

68. Defendants Does 16 to 20 and the City of Los Angeles failed to train Defendants Does 1 to 10 and 11 to 15 on the risks that using batons or LLMs to clear people attending a demonstration would pose to the rights of people attending demonstrations, including the First Amendment rights of photographers and others.

69. As a direct and proximate result of the aforementioned acts and omissions of Defendants, Plaintiffs suffered damages in an amount to be established at trial.

70. Defendants acted in reckless and callous disregard for Plaintiff's rights. The wrongful acts, and each of them, were willful, oppressive, fraudulent and malicious, thus warranting the imposition of punitive damages against Defendants in an amount adequate to punish the wrongdoers and deter future misconduct.

71. Defendants' acts and omissions have put Plaintiffs in reasonable fear that if they engage in the constitutionally protected activity of observing and documenting protests in the future, Defendants will subject them to excessive force, harassment, detention, citation, and arrest, chilling Plaintiffs' constitutionally protected expressive activity.

## SECOND CAUSE OF ACTION
## Excessive Force in Violation of the Fourth and Fourteenth Amendments to the U.S. Constitution; 42 U.S.C. § 1983
## (Against all Defendants)

72. Plaintiffs reallege and incorporate herein by reference the preceding and any subsequent paragraphs in this Complaint.

73. Under the Fourth Amendment, applicable to Defendants through the Fourteenth Amendment, Plaintiffs have the right to be free from unlawful seizures of their person, including right to be free from excessive and unreasonable use of force.

74. As alleged above, Defendants violated Plaintiffs' rights by using unreasonable force against them.

75. Plaintiffs never posed any threat or danger to law enforcement or others, nor did they ever appear to pose any threat or danger to anyone.

76. In using unlawful and excessive force on Plaintiffs, Defendants 1 to 10 acted pursuant to a policy, custom, or practice of the City of Los Angeles.

77. Defendants' conduct also constituted deliberate indifference to a foreseeable risk of harm to Plaintiffs and to a risk of violations of their rights, in violation of the Fourteenth Amendment.

78. Upon information and belief, Defendants Does 11 to 15 knew of LAPD officers' (including Defendant Does 1 to 10) custom and practice of policing protests by pushing demonstrators, striking them with batons, knocking them down, firing LLMs without justification, without regard to whether they were protesters or journalists, and Does 11 to 15 participated in, approved, directed, or ratified the decisions and actions of individual LAPD officers in the violations of Plaintiff's rights alleged herein; and they intended that result or were deliberately indifferent to the risk that people attending the demonstration would get shoved down or hit with batons or struck with LLMs without justification.

79. Upon information and belief, Defendants Does 16 to 20 participated in forming the LAPD's policy, training, custom and practice on dispersal of people at demonstration, and treatment of reporters and photographers at demonstrations. Defendants Does 16 to 20 knew that the polices they created, promulgated, advanced, and endorsed would likely result in violations of the constitutional rights of members of the public such as Plaintiffs, or were deliberately indifferent to that risk.

80. Defendants Does 16 to 20 and the City of Los Angeles failed to train Defendants Does 1 to 10 and 11 to 15 on the risks that using batons or LLMs to clear people attending a demonstration would pose to the rights of people attending demonstrations, including the rights of photographers and others to be free from excessive force.

81. As a direct and proximate result of the aforementioned acts and omissions of Defendants, Plaintiff suffered damages in an amount to be established at trial.

**THIRD CAUSE OF ACTION**
**Wrongful Detention/Arrest in Violation of the**
**Fourth and Fourteenth Amendments to the U.S. Constitution;**
**42 U.S.C. § 1983**
**(Plaintiff Beckner-Carmitchel Against Defendants City of Los Angeles, Does 2 to 20)**

82. Plaintiffs reallege and incorporate herein by reference the preceding and any subsequent paragraphs in this Complaint.

83. Under the Fourth Amendment, applicable to Defendants through the Fourteenth Amendment, Plaintiffs have the right to be free from unlawful seizures of their person, including wrongful detention without adequate cause.

84. California Penal Code § 409.7 expressly provides that if police "establish a police line, or rolling closure at a demonstration, march, protest, or rally where individuals are engaged in activity that is protected pursuant to the First Amendment to the United States Constitution or Article I of the California Constitution…[a] duly authorized representative of any news service, online news service, newspaper, or radio or television station or network may enter the closed areas described in this section;" that "[a] peace officer or other law enforcement officer shall not intentionally assault, interfere with, or obstruct the duly authorized representative of any news service, online news service, newspaper, or radio or television station or network who is gathering, receiving, or processing information for communication to the public," and that "[a] duly authorized representative of any news service, online news service, newspaper, or radio or television station or network that is in a closed area described in this section shall not be cited for the failure to disperse, a violation of a curfew," or obstructing an officer, and that if a "duly authorized representative is detained by a peace officer or other law enforcement officer, that representative shall be permitted to contact a supervisory officer immediately for the purpose of challenging the detention, unless circumstances make it impossible to do so."

85. On August 8, Plaintiff Beckner-Carmitchel was a duly authorized representative of a news service, online news service, newspaper, or radio or television station or network.

86. As alleged above, Defendants Molina Morales and Does 2 to 10 violated Plaintiff Beckner-Carmitchel's rights detaining him without legal justification, in direct violation of Penal Code § 409.7.

87. Upon information and belief, Defendants Does 11 to 15 knew of LAPD officers' (including Defendant Does 1 to 10) practice of policing protests by kettling and

detaining people without regard to whether they were protesters or journalists, and Does 11 to 15 participated in, approved, directed, or ratified the decisions and actions of individual LAPD officers in the violations of Plaintiff's rights alleged herein; and they intended that result or were deliberately indifferent to the risk that journalists covering the demonstration would get detained or arrested without justification.

88. Upon information and belief, Defendants Does 16 to 20 participated in forming the LAPD's policy, training, custom and practice on dispersal of people at demonstration, and treatment of reporters and photographers at demonstrations. Defendants Does 16 to 20 knew that the polices they created, promulgated, advanced, and endorsed would likely result in violations of the constitutional rights of members of the public such as Plaintiffs, or were deliberately indifferent to that risk.

89. Defendants Does 16 to 20 and the City of Los Angeles failed to train Defendants Does 1 to 10 and 11 to 15 on the risks that using batons or LLMs to clear people attending a demonstration would pose to the rights of people attending demonstrations, including the rights of photographers and others to be free from unlawful detentions and arrest.

90. As a direct and proximate result of the aforementioned acts and omissions of Defendants, Plaintiff suffered damages in an amount to be established at trial.

**FOURTH CAUSE OF ACTION**

**Violation of the Bane Act, Cal. Civil Code § 52.1**

**(Against All Defendants)**

91. Plaintiffs reallege and incorporate herein by reference the preceding and any subsequent paragraphs in this Complaint.

92. The federal and state constitutions guarantee freedom of the press, freedom of speech, as well freedom from unnecessary and excessive force by law enforcement officers. Defendants, by engaging in the wrongful acts and failures to act alleged above, denied Plaintiffs and their members and other journalists present at the protests of their constitutional and statutory rights by threats, intimidation, or coercion, to deter, prevent and in retaliation for the exercise of their First and Fourth Amendments to the U.S.

Constitution; Article I, §§ 2 and 13 to the California constitution, in violation of Cal. Civ. Code § 52.1.

93. California Civil Code, Section 52.1, known as the Tom Bane Civil Rights Act, provides that : "if a person or persons, whether or not acting under color of law, interferes by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States or of the rights secured by the Constitution or laws of this state," a person whose such rights have been interfered with or attempted to be interfered with may prosecute an action "for damages, including, but not limited to, damages under Section 52, injunctive relief, and other appropriate equitable relief to protect the peaceable exercise or enjoyment of the right or rights secured, including appropriate equitable and declaratory relief to eliminate a pattern or practice of conduct." Cal. Civ. Code § 52.1.

94. As alleged herein, Defendants unlawfully used force, the threat of force, including arrest and the threat of arrest, against Plaintiffs to intimidate them and interfere with their constitutional right to photograph and document public events for publication and to engage in expressive conduct and newsgathering.

95. As alleged herein, Defendants unlawfully used force and the threat of force against Plaintiffs to intimidate them, and interfere with their constitutional right to document public events as the press, in violation of California Penal Code §§ 409.7 and 13652 to access closed areas and to be free from intentional assault, interference or obstruction by law enforcement while reporting.

96. Defendants used threats, intimidation, and coercion to interfere with rights secured under the Constitution of the United States, the constitution of the State of California, and the statutory laws of the State providing protection to members of the press and public at protests. The use of any force, let alone unreasonable force, by Defendants was a substantial factor in causing the violation of rights and attendant harm endured by Plaintiffs at the protests.

97. Plaintiffs had a right to bodily integrity and to be free from the infliction of battery when Defendant Doe 1 fired an LLM at Ms. Jones, or Defendants Molina and Does 2 to 10 shoved them or struck them with batons. Defendants made offensive physical contact with Plaintiff without Plaintiff's consent which caused Plaintiff harm. A reasonable person under the circumstances would have been offended by the touching. California Civil Code § 43 confers a right to be secure in one's bodily integrity.

98. In acting as alleged herein, Defendants used threats and intimidation to interfere with rights secured under the Constitution of the United States, the Constitution of the State of California, and the statutory laws of the State providing protection to Plaintiff while he photographed on public streets and sidewalks and other places open to the public.

99. As a direct and proximate result of the aforementioned acts or omissions of Defendants, Plaintiffs suffered damages in an amount to be established at trial.

**FIFTH CAUSE OF ACTION**
**False Imprisonment/False Arrest under California law**
**(By Plaintiff Beckner-Carmitchel Against Defendants City of Los Angeles, and Officer Molina, and Does 2 to 20)**

100. Plaintiffs reallege and incorporate herein by reference the preceding and any subsequent paragraphs in this Complaint.

101. False imprisonment is the nonconsensual, intentional confinement of a person, without lawful privilege for an appreciable period of time, however brief.

102. False imprisonment is the unlawful violation of the personal liberty of another.

103. False arrest is one way of committing false imprisonment.

104. Defendants Molina Morales and Does 2 to 10 falsely arrested Plaintiff Beckner-Carmitchel. On information and belief, Does 2 to 20 advised, suggested, authorized, and ordered the arrest.

105. Defendants Molina Morales and Does 2 to 20 caused the arrest of Plaintiff, and intentionally confined him without lawful privilege or legal basis.

106. The City of Los Angeles, as the employer of Defendants, is liable under the principle of *respondeat superior* for their conduct as its employees within the course and scope of their employment.

107. Pursuant to California Government Code 815.2 (a), a public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would, apart from this section, have given rise to a cause of action against that employee or his personal representative

108. Plaintiff suffered damages in an amount to be established at trial.

**SIXTH CAUSE OF ACTION**
**Assault and Battery under California law**
**(Against all Defendants)**

109. Plaintiffs reallege and incorporate herein by reference the preceding and any subsequent paragraphs in this Complaint.

110. Defendants Molina Morales battered Plaintiffs by shoving Ms. Jones to the ground with his baton and striking Mr. Beckner-Carmitchel with his baton.

111. Defendant Doe 1 battered Plaintiff Jones by shooting and hitting her with an LLM.

112. These Defendants acted with an intent to cause harmful or offensive contact with Plaintiff and the intended harmful or offensive contact did in fact occur.

113. The harmful or offensive contact was not privileged nor consented to and was excessive, unreasonable and done with deliberate indifference to the rights and safety of Plaintiff and was done with the intent to inflict punishment.

114. On information and belief, Defendants 2 to 20 advised, suggested, authorized, and ordered the harmful or offensive contact.

115. As a result of the Defendants' intent to cause harmful or offensive contact with Plaintiff and the fact that the intended harmful or offensive contact did in fact occur, Plaintiff suffered damages according to proof at the time of trial.

**SEVENTH CAUSE OF ACTION**
**Negligence**
**(Against all Defendants)**

116. Plaintiff realleges and incorporates herein by reference the preceding and any subsequent paragraphs in this Complaint.

117. All Defendants had a duty to Plaintiffs to act with ordinary care and prudence so as not to cause harm or injury to another.

118. Upon information and belief, Defendants Doe 1 improperly, negligently, wrongfully, and recklessly fired an LLM that struck Plaintiff Jones.

119. Upon information and belief, Defendants Molina and Does 2 to 10 improperly, negligently, wrongfully, and recklessly pushed Plaintiffs and used force including shoving and baton strikes, without distinction between protesters and press, and used tactics (including failing to give a dispersal order or clear instructions and attempting to move crowds by force faster than people could respond) that predictably led to their use use of unjustified force on Plaintiffs.

120. Upon information and belief, Defendants Does 11 to 15 improperly, negligently, wrongfully, and recklessly participated in, approved, directed, or ratified the decisions and actions of Defendants Does 1 to 10 in their violations of Plaintiffs' rights, without the exercise of ordinary care for the rights of people attending demonstrations like Plaintiffs to be free of injury from police and to engage in expressive conduct like photographing.

121. Upon information and belief, Does 16 to 20 improperly, negligently, wrongfully, and recklessly formed the LAPD's policy and training on dispersal of protesters, including through the use of mounted units, without the exercise of ordinary care for the rights of people attending demonstrations like Plaintiffs to be free of injury form officers and to engage in expressive conduct like photographing.

122. The City of Los Angeles is liable for injury caused by the negligence of its employees pursuant to Government Code section 815.2.

123. The decisions of Doe Defendants 1 to 20 that caused harm to Plaintiffs were

neither carefully balanced basic policy decisions nor planning (as opposed to operational) decisions.

124. By engaging in the acts alleged herein, Defendants failed to act with ordinary care and breached their duty of care owed to Plaintiffs.

125. The City is responsible for the acts of individual and Doe Defendants under the theory of *respondeat superior*.

126. As a direct and proximate result of the aforementioned acts or omissions of Defendants, Plaintiff suffered damages in an amount to be established at trial.

127. The conduct of the individual Defendants also amounts to oppression, fraud or malice within the meaning of Civil Code Section 3294 et seq. and punitive damages should be assessed against each defendant for the purpose of punishment and for the sake of example.

## REQUEST FOR RELIEF

Wherefore, Plaintiffs seek judgment as follows:

1. An award of general and special damages according to proof at time of trial;
2. Punitive damages in an amount sufficient to punish and deter;
3. An award of attorneys' fees pursuant to 42 U.S.C. § 1988 and Cal. Civil Code §§ 52(b) & 52.1(h) and Cal. Code of Civ. Proc. § 1021.5;
4. Costs of suit;
5. Pre- and post-judgment interest as permitted by law;
6. Such other and further relief as the Court may deem just and proper.

\\\

\\\

\\\

\\\

\\\

\\\

## DEMAND FOR JURY TRIAL

Plaintiffs, pursuant to the Seventh Amendment of the U.S. Constitution and Rule 38, Federal Rules of Civil Procedure, demand a trial by jury.

Dated: June 12, 2026

Respectfully submitted,

LAW OFFICE OF PETER BIBRING

By: ______________________
Peter Bibring

*Attorney for Plaintiffs*